Drake, Oh. J.,
dissenting;
I dissent from the opinion just read.
The case, in its material features, is set forth in the claimant’s petition, and in an affidavit made by him in support of his claim, and filed in the Department of War. From those papers I gather the principal part, of the facts which will .now be stated.
In the fall of the year 1864, the claimant, under a written contract, furnished to the United States at Point of Books and vicinity, west of Fort Lyon, Colorado, on the Arkansas Biver, 2,000 tons of hay, at $38.50 per ton, which was duly received and paid for by the United States.
Anticipating a further demand for hay by the United States at that point, the claimant continued cutting hay until frost came, in order to be sure to have sufficient to fill said contract, and because he believed the Government would need any surplus that he might have. The result was that he prepared and had ready the additional quantity of 536 tons of hay, over and above the 2,000 tons furnished under his contract.
Lieut. Clark Dunn, quartermaster at Camp Fillmore, concurred with the claimant in the belief that the Government would need all the hay in that neighborhood; but as he was not authorized to purchase, he gave to the claimant a memorandum receipt in the following words:
“Point or Books, November 27, 1864.
“ Beceived of A. J. Gill five hundred and thirty-six tons of hay, in good order and well ricked, for use of Government.
“ OLAEK DUNN,
"First Lieut. 1st Gar. of Gol., Quartermaster Gamp Fillmore.”
The said Dunn referred the claimant to the commander of the district and quartermaster at Denver, who could purchase the hay if they saw fit. The commander of the district, however, thought he would not be justified in purchasing it at that time, and did not do so.
It does not appear that the claimant ever returned to where *396 tbe hay was, after the refusal of the commander of the district to buy it, but in consequence of the Indian troubles existing in the winter of 1864-’65, it was unsafe for small parties to remain outside of Government posts, especially in that locality; and he was therefore compelled to leave the hay without any one in charge of it, and on the 4th of February, 1865, he left Colorado on a business trip, and did not return thither until the summer of 1866.
The statement thus far is to a large extent in the words of the claimant himself, as found in his petition and affidavit.
The use and abuse of his hay by Government troops, or parties in the Government service, rests upon the evidence of witnesses.
Upon the whole case the majority of the court give him judgment for three-fourths of the 536 tons of hay, as having been either used or trodden down and ruined by such troops and parties; and the judgment is at the rate of $45 per ton, which is $6.50 more per ton than the claimant demanded in his petition, or in the brief of his counsel.
The case, condensed, is this: that, without the order or request of any officer of the Government, the claimant cut and ricked 536 tons of hay, ostensibly in connection with a contract, but in reality for speculation on the Government; that it was cut and ricked in a wild country, which was so infested with hostile Indians as to preclude his leaving any one in charge of it; that he tried but failed to sell the hay to the Government, and from the time of such failure till the present hehas, so far as shown, never attempted to exercise ownership over the hay, but, as I consider, abandoned in the wilderness what he was powerless to keep in possession or to protect, and what, after the refusal of the Government officers to buy, he could put to no possible use.
I can see no right or justice in making the Government pay for hay so abandoned. The following are the reasons for my dissent:
1. If the claimant ever had property in the 536 tons of hay, he renounced it wdien he left the hay in a wild and savage land, where he had, and could have, no force or law to protect it, and where he dared not go, or have another go, to guard or even oversee it. So to leave it was necessarily to abandon it o inevitable and speedy decay, or to destruction by marauders, *397 or to the use of any wayfarers who, while using it, were able to protect themselves against the savages of that region.
2. If, however, the claimant had property in the hay, and Government troops and parties took and used the hay without his knowledge or consent — much more if they scattered and trampled it under foot — it was a trespass, for which no action lies iu this or any other court against the Government. The case seems to me to be pointedly condemned by the expressions of the Supreme Court in Gibbons v. United States, (8 Wallace, 269.) Said that court: “The language of the statutes which confer jurisdiction upon the Court of Claims excludes, by the strongest implication, demands against the Government founded on torts. The general principle which we have already stated as applicable to all governments, forbids, on a policy imposed by necessity, that they should hold themselves liable for unauthorized wrongs inflicted by their officers on the citizen, though occurring while engaged in the discharge of official duties. In the absence of adjudged cases determining how far the Government may be responsible on an implied assumpsit for acts which, though unauthorized, may have been done in its interest, and of which it may have received the benefit, the apparent hardships of many such cases present strong appeals to the courts to indemnify the suffering individual at the expense of the United States. These reflections admonish us to be cautious that we do not permit the decisions of this court to become authority for the righting in the Court of Claims of all wrongs done to individuals by the officers of the General Government, though they may have been committed while serving that Government, and in the belief that it was for its interests. In such cases, where it is proper for the nation to furnish a remedy, Congress has wisely reserved the matter for its own determination. It certainly has not conferred it on the Court of Claims.”
3. But if the preceding views are erroneous, and the claimant’s right of action should be held good, what should he recover? Manifestly no more than what the hay was worth to him at the spot where he left it, about fifteen miles from Fort Lyon, iu a place where no civilized people lived, or could venture to attempt to live, and where a military guard was necessary while he was engaged in cutting the hay. When he cut and ricked it there, he knew the absolute impossibility of his removing it thence, except with military transportation and guard. And *398 be knew, moreover, that he had not, and could not command, any such transportation or guard. And he still further knew that if the Government should decline to purchase and remove the hay, it was certain that it must stay till it rotted just where he ricked it, unless it should be fed to the animals of parties passing by.
Its value to him at that spot is, therefore,- the measure of his damages, if he is entitled to any. The value of hay delivered at Fort Lyon affords no criterion for estimating the value of hay at the place where this was. I have looked in vain in the record for any evidence that the claimant’s hay at the Point of Bocks, fifteen miles away from Fort Lyon, had any money-value whatever. It is evident to me that his view of its value was not in the thing itself, which he could not utilize, but in the anticipated sale of it to the Government, which could utilize it. When that hope vanished, so did the money-value of the hay to him. There was but one possible market for it in all that great region; and when that failed, there was probably not a man in the United States who would have given him ten cents a ton for what it might have cost him his scalp to attempt to reduce to possession.
These are my reasons for dissenting from the judgment of the majority of the court.